# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF MICHIGAN

BRIAN MARKUS, individually and on
behalf of all others similarly situated,

                    Plaintiff,

          v.

GENERAL MOTORS, LLC,

                    Defendant.

Case No.:

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Brian Markus ("Plaintiff"), individually and on behalf of all those similarly situated, complains of Defendant General Motors, LLC ("GM" or "Defendant"), based upon his personal knowledge as to facts specific to him and based upon the investigation of counsel in all other respects, as follows:

## I.    INTRODUCTION

1.     An automobile purchase is one of the most expensive and important decisions consumers make. Consumers rely upon automakers' superior knowledge to manufacture and sell cars that are safe and free from defects. That is why, GM claims to be "committed to safety in everything we do" when it markets its vehicles.[1] Yet, GM knowingly sold hundreds of thousands of Class Vehicles[2] containing a potentially deadly defect lurking in their vehicles' engines—putting countless lives at risk to this day.

2.     The L87 Engine's performance depends on the integrity of its internal components, particularly the crankshaft, connecting rods, and engine bearings. However, GM has concealed for years that the bearings in their L87 Engines are

---

[1] Exhibit 1, https://www.gm.com/content/dam/company/docs/us/en/gmcom/gmsafetyreport.pdf (last visited June 12, 2025).

[2] The Class Vehicles are GM vehicles installed with the L87 6.2L V8 engine ("L87 Engine"). On information and belief, the L87 Engine is found in the following GM vehicles: 2019-2024 Chevrolet Silverado 1500; 2021-2024 Chevrolet Tahoe; 2021-2024 Chevrolet Suburban; 2019-2024 GMC Sierra 1500; 2021-2024 GMC Yukon; 2021-2024 GMC Yukon XL; 2021-2024 Cadillac Escalade; and 2021-2024 Cadillac Escalade ESV.

known to be prone to, and have experienced failure, resulting in breaching of the engine block by the connecting rod and/or engine seizure (the "Engine Defect").

3.     The Engine Defect renders the Class Vehicles unsafe and unreliable. Drivers are left with Class Vehicles that can experience catastrophic engine failure at any moment. This is all the more dangerous because it can cause the loss of motive power while driving at high speeds, increasing the risk of a crash.

4.     After years of customer complaints, individual lawsuits and claims for arbitration arising from the Engine Defect, in April 2025, GM issued a safety recall in which it admitted the existence of the defect and that it can result in crashes and injuries (the "2025 Recall"). But the purported "remedy" offered in the Recall is woefully inadequate because it does nothing to address the root causes of the Engine Defect, and leaves Plaintiff and Class Members in the lurch as they wait for a catastrophic engine failure.

5.     Not only does the unremedied safety risk of the Engine Defect impact Plaintiff and Class Members, the significant loss in value as a result of GM's failure to disclose the Engine Defect is no less of a concern for Plaintiff and Class Members that spent tens of thousands of dollars for their trucks. Had GM fulfilled its duty to disclose the Defect, Plaintiff and other Class Members would not have purchased their Class Vehicles or would have paid less for them.

6.      GM's utter disregard for the safety of its consumers came at a total surprise to Plaintiff and other Class Members who were repeatedly told by GM that their vehicles undergo many hours of detailed pre-sale durability testing and that the manufacturer places an emphasis on quality and durability.

7.      Had Plaintiff and other Class Members known of the Defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles or would have paid substantially less for them.

8.      As a result of Defendant's unfair, deceptive, and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiff and Class Members, have suffered an ascertainable loss of money and/or property in the form of, for example, loss of value, loss of use of the vehicles, and repair costs.

9.      Accordingly, Plaintiff brings this action to redress Defendant's misconduct. Plaintiff seeks equitable relief in the form of a remedy for the Defect, an appropriate curative notice regarding the existence of the Defect, recovery of damages, a repair under state consumer-protection statutes and implied warranties, and reimbursement of all expenses associated with the repair or replacement of the Class Vehicle and damage caused by the Defect.

## II.   JURISDICTION

10.     This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §§1332(d)(2) and (6) because: (i) there are 100 or

more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs, and (iii) there is minimal diversity because plaintiff and defendant are citizens of different states. This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

11.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because GM transacts substantial business and because GM is headquartered in this district. GM advertised in this district and received substantial revenue and profits from sales and/or leases of the Class Vehicles in this district. Therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

12.     This Court has personal jurisdiction over GM by virtue of its transactions and business conducted in this judicial district, and because GM is headquartered in this state.

### III.  PARTIES

**A.     Plaintiff**

13.     Plaintiff Brian Markus is a resident of Chesterfield, Missouri. Markus purchased a new 2024 GMC Sierra 1500 AT4X 6.2L from Laura Buick-GMC located at 903 N. Bluff Rd., Collinsville, Illinois 62234, in or around March 2024.

14.     Laura Buick-GMC is part of GM's network of authorized dealers across the United States, and is promoted on GM's website for its GMC brand, which includes an updated list of the dealership's inventory.[3]

15.     Markus purchased his Class Vehicle because he believed that the vehicle was safe, reliable, and of the highest quality.  When shopping for his Class Vehicle, Markus researched and considered the reliability and quality of the make and manufacturer. Prior to purchasing his Class Vehicle, Markus heard, viewed, and/or read GM marketing materials and advertisements including brochures, commercials, and internet advertisements that touted the quality, reliability and safety of GM vehicles.

16.     At no point before Markus purchased his vehicle did GM disclose that his vehicle suffered from the Defect, which results in catastrophic engine failure and places drivers and passengers at risk of physical injury.

17.     Markus did not receive the benefit of his bargain. Markus purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding quality design, and safe and reliable operation. The Defect has significantly diminished the value of Markus's Class Vehicle.

---

[3] Exhibit 2, https://www.gmc.com/locate-gmc-dealer (last visited June 12, 2025).

18.     Had Defendant disclosed the Defect, Markus would not have purchased his Class Vehicle, or would have paid less to do so.

19.     Markus purchased his Class Vehicle and it included GM's manufacturer warranty. At all times, Markus maintained his vehicle in accordance with GM's guidance.

20.     Markus would purchase a GM vehicle in the future if GM's representations about the vehicle, including its quality, safety, and durability, were accurate.

21.     In November 2024, while Markus was driving his Class Vehicle, a warning light illuminated on the dashboard indicating that the engine oil was low.

22.     Markus was very confused and surprised to see this warning as he was always diligent in checking his oil level and otherwise maintaining his vehicle in accordance with GM's guidance. Markus then drove to the nearest gas station to inspect the vehicle. Markus inspected the oil dipstick and was shocked to find there was no oil left in the tank. Markus then added a quart of oil and waited to check again.

23.     The next day, brought his car for inspection to O'Fallon GMC, an authorized GM dealer located at 2150 Technology Drive, O'Fallon, Missouri 63368. The dealership provided him with an oil consumption plan and informed him that oil had been getting into the combustion chamber.

24.     On or about December 29, 2024, Markus experienced catastrophic engine failure. While Markus was driving his Class Vehicle (which had approximately 14,000 miles on the odometer at the time) at 60 miles per hour, multiple warning indicators lit up, dangerously distracting Markus before the engine stopped running. Markus immediately pulled over and turned the vehicle off. When Markus tried restarting the engine approximately 20 minutes after pulling off the road, the vehicle would not start. Markus was stranded on the highway for 2 hours before a tow truck came, which took his vehicle to Laura Buick-GMC for further evaluation. Laura Buick-GMC determined that his Class Vehicle had spun rod bearings, a severely damaged crankshaft, and that his L87 Engine had to be replaced.

25.     Markus was diligent in maintaining his vehicle but is now concerned about driving it due to the dangers resulting from the Engine Defect. Markus would not have purchased the vehicle, or would have paid less for it, had Markus known about the Engine Defect.

**B.     Defendant**

26.     Defendant GM is a Delaware corporation with its headquarters and principal place of business located in Detroit, Michigan. The sole member and owner of General Motors LLC is General Motors Holdings LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan.

27.    Defendant GM, through its various entities and brands, including Chevrolet (also referred to as Chevy), Cadillac, Buick, and GMC, is in the business of designing, manufacturing, distributing, and selling GM-brand automobiles in this District, in the jurisdictions of Plaintiff's Class Vehicle purchase, and in the jurisdictions of all U.S. states whose Class claims are iterated herein. GM and/or its agents designed, manufactured, and installed the L87 Engines in the Class Vehicles. GM also developed and disseminated the materially misrepresentative owner's manuals and warranty booklets, advertisements, and other intentionally unreasonable and deceptive promotional materials relating to the Class Vehicles. GM also designed advertising material that it sent to GM dealerships for the purpose of having dealers distribute these materials to consumers, GM authorized dealers to communicate with consumers about the performance of the vehicles, and GM ensured that the dealership was a place where GM could disclose material facts to prospective buyers.

28.    On its own website, GM owns and controls the Chevrolet, Cadillac, Buick, and GMC brand websites.

## IV.  SUBSTANTIVE ALLEGATIONS[4]

### A. GM is one of the most popular automakers in the United States by promoting the safety and reliability of their vehicles.

29.    GM, founded in 1908 in Flint, Michigan, is one of the largest and most iconic automobile manufacturers in the United States. GM played a central role in shaping the American auto industry throughout the 20th century, selling its vehicles under various brands such as Chevrolet, GMC, Cadillac, and Buick.

30.    Since its bankruptcy in 2009, GM has rebounded by focusing on its rich legacy of reliable vehicles. As of 2024, GM holds approximately 16.5% of the U.S. auto market, making it one of the top automakers in the country by market share.[5]

31.    GM sells and services its vehicles through its network of more than 4,000 dealerships nationwide.

32.    GM marketed and sold hundreds of thousands of Class Vehicles nationwide, including through their nationwide network of authorized GM dealers and service providers. GM sells its vehicles through its authorized dealerships. After these dealerships sell cars to consumers, including Plaintiff and Class Members, they acquire additional inventory from GM to replace the vehicle sold, increasing GM's revenues. GM also sells replacement parts to their dealerships for use to service,

---

[4] Emphasis added throughout unless stated otherwise.

[5] Exhibit 3, https://news.gm.com/home.detail.html/Pages/news/us/en/2025/jan/0103-gmsales.html (last visited June 12, 2025).

maintain, and repair vehicles, including the Class Vehicles. Thus, Plaintiff's and Class Members' purchase of Class Vehicles and their replacement parts accrue to the benefit of GM by increasing their revenues.

33. Throughout GM's marketing and promotion of the Class Vehicles are promises touting the safety, reliability, quality, and performance of the vehicles, including their L87 Engines.

34. For example, GM marketed the 2022 Chevrolet Silverado 1500 as "a versatile and powerful full-size pickup truck that combines rugged capability with modern technology and style."[6]

35. When promoting the 2024 Sierra 1550, GM states that the truck "is built to help you master untamed backcountry" and is "[t]he new peak of premium off-roading."[7] As part of the marketing depicting the truck as reliable and durable, GM states that the L87 Engine "has the serious power you need for big jobs or big fun." As for "Safety," GM tells driver to "[g]o forth with added confidence."[8]

---

[6] Exhibit 4, https://kunesgm.com/blog/2022-chevrolet-silverado-1500-ltd-rugged-reliable-and-feature-packed-pickup (last visited June 12, 2025).
[7] Exhibit 5, https://www.gmc.com/trucks/previous-year/sierra/1500/at4 (last visited June 12, 2025).
[8] *Id*.

36.     The "performance" of its L87 Engine was prominently featured in GM's marketing of the Class Vehicles, including the 2024 Escalade:[9]



6.2L V8 ENGINE

The standard 6.2L 420-hp V8 is paired with an intelligent 10-speed automatic transmission that moves among gears in a smooth, efficient fashion. Engine technologies such as Continuously Variable Valve Timing, Direct Injection and Dynamic Fuel Management also help ensure this power plant's 460 lb-ft of torque (623 Nm) is harnessed efficiently.

37.     Likewise, in its marketing for the 2024 Suburban's "performance," GM calls the vehicle a "Power player[:] When it's time to perform, Suburban is ready for the spotlight. That's the kind of confidence you can count on, since the capable and efficient Suburban can tow heavy loads and accelerate from a stop to highway speeds with ease."[10] Moreover, GM claims "We care about your safety — big time."

---

[9] Exhibit 6,  https://brochures.cadillac.com/2024/escalade/performance/ (last visited June 12, 2025).
[10] Exhibit 7, https://www.chevrolet.com/suvs/previous-year/suburban (last visited June 12, 2025).

38.     Despite these promises relating to the performance and safety of the Class Vehicles, at no point did GM warn consumers of the Engine Defect, which renders all other statements false and/or misleading.

**B.      Internal combustion engines require durable components, including engine bearings, for the safe and dependable operation of the vehicles.**

39.     Internal combustion engines work by sucking a mixture of gasoline and air into a cylinder, compressing it with a piston, and igniting it with a spark. This is known as the combustion cycle. The resulting explosion rotates the crankshaft, the mechanical component that converts reciprocating (up and down) motion of pistons into rotational motion, ultimately driving the vehicle's wheels.

40.     Below is a diagram of a traditional four-stroke combustion cycle:



41.     As shown above, the combustion cycle turns the explosion in the cylinder into movement of the wheels using two crucial components: connecting

rods and bearings. A connecting rod is the connection between the engine's piston and a crankshaft. Its purpose is to convert the linear, up-and-down motion of the piston into the rotary motion of the crankshaft, which is accomplished as the crankshaft rotates many thousands of times per minute within each connecting rod.

42.     Engine bearings are crucial components for the proper functioning of an internal combustion engine. Engine bearings are metal sleeves encircling the rotating components of the engine, including the connection rods. The bearings reduce metal-on-metal friction by holding the rotating connecting rods in place on top of a thin layer of oil, which creates a protective buffer between the crankshaft and the connecting rod.

43.     Engine bearings are primarily located between the crankshaft and the engine block (main bearings), and between the connecting rods and the crankshaft (rod bearings). They allow these heavy, high-speed parts to move smoothly while maintaining alignment and minimizing metal-to-metal contact. Without engine bearings, the internal parts of an engine would wear down quickly due to heat and friction, leading to catastrophic engine failure.

44.     There are generally three types of engine bearings.

45.     The main (crankshaft) bearings support the crankshaft and allow it to rotate within the engine block. The main bearings absorb loads from combustion and transfer them to the engine block. Main bearings are mounted in the crankcase. A

main bearing consists of two parts: upper and lower. The upper part of a main bearing commonly has an oil groove on the inner surface that allows it to spin freely inside the bearing without generating excessive friction and heat. A main bearing has a hole for passing oil to the feed holes in the crankshaft.[11]

46.    The connecting rod bearings sit between the connecting rods and the crankshaft journals, and allow the rods to pivot as the crankshaft rotates, converting reciprocating motion to rotary motion.[12]

47.    The camshaft Bearings support the camshaft, enabling it to spin and control the opening and closing of the valves.[13]

48.    Below is a diagram of a four-cylinder engine (which functions in the same manner as an eight cylinder engine such as the L87 Engine.[14]

---

[11] Exhibit 8, https://www.substech.com/dokuwiki/doku.php?id=bearings_in_internal_combustion_engines (last visited June 12, 2025).

[12] *Id.*

[13] *Id.*

[14]   *Id.*



49.    Engine bearings are necessary to maintain proper oil film clearance for lubrication, absorb and distribute mechanical loads, and prevent metal-to-metal contact under high-speed, high-load conditions. If engine bearings fail (due to oil starvation, debris, or wear), the engine can seize or suffer major internal damage.

50.    Damaged or faulty connecting rod bearings may result in excessive rod knock, which is a rapping noise produced by the engine. This means that the clearance between the connecting rod and crankshaft has changed, causing the knocking sound.

**C.    GM sold hundreds of thousands of dangerous Class Vehicles with defective L87 Engines.**

51.    Despite GM's consistent marketing and repeated promises of safety, quality, and durability of the Class Vehicles, the L87 Engine installed in each Class Vehicle contains a defect that poses a dangerous risk to the safety of drivers, passengers, and bystanders. Specifically, L87 Engines suffer from bearing failure that results in either engine seizure or breaching of the engine block by the connecting rod.  What makes this Defect all the more dangerous is that there is no detectability of the Defect prior to the failure.

52.    The L87 is a 6.2-liter, eight-cylinder engine introduced in 2018 by GM that is found in a range of GM pickup trucks and SUVs.[15] The L87 is part of the second-generation EcoTec3 engine family, and is the direct successor to the GM L86 engine. It was first launched in the all-new 2019 Silverado 1500 (fourth generation) and 2019 Sierra 1500 (fourth generation).[16]

53.    GM promoted the L87 as an advancement in engine technology, stating: "The L87 builds upon the previous 6.2L L86 with integral components for Automatic Start/Stop capability and available Dynamic Fuel Management (DFM) for even greater efficiency. Efficient, robust technologies including Direction

---

[15] Exhibit 9, https://gmauthority.com/blog/gm/gm-engines/l87/ (last visited June 12, 2025).
[16] *Id.*

Injection, Variable Valve Timing, oil-jet piston cooling, and a two-stage oil pump continue to be standard on L87."[17]

54.     According to Jordan Lee, Chevy's chief engineer for small block engines, "[t]he increased variability of dynamic fuel management means the engine will operate more often with a reduced number of cylinders, which saves fuel across the board," Lee said in a statement.[18] "Better yet, the transitions are transparent, and because the system is torque-based, you've always got that satisfying feeling of power on demand that comes from Chevy's Gen V small block V-8 engines." [19]

55.     The L87 Engine was introduced by Chevrolet, but it is found in many GM's full-size trucks and SUVs, including the Chevrolet Silverado, GMC Sierra, Chevrolet Tahoe, Chevrolet Suburban, and GMC Yukon.

56.     The L87 Engine installed across GM Class Vehicles shares the same designs, parts, and manufacturing process.

57.     As detailed below, the Class Vehicles have a common defect that endangers driver, passengers, and bystanders, as the L87 engine bearings are prone to failure, resulting in sudden seizure of the engine. Such engine seizure, often

---

[17] Exhibit 10, https://poweredsolutions.gm.com/products/engines/l87-engine#:~:text=The%20L87%20builds%20upon%20the,DFM)%20for%20even%20greater%20efficiency (last visited June 12, 2025).

[18] Exhibit 11, https://www.detroitnews.com/story/business/autos/general-motors/2018/05/18/new-chevy-silverado-engines/35046583/ (last visited June 12, 2025).

[19] *Id.*

occurring while the Class Vehicle is being driven at full speeds on the road, makes it extremely risky for Class Members to continue to drive their Class Vehicles.

58.     In April 2025, GM finally revealed that the L87 Engines installed in the Class Vehicles suffer from the Engine Defect. In connection with the 2025 Recall, GM revealed that "[t]he connecting rod and/or crankshaft engine components in these vehicles may have manufacturing defects that can lead to engine damage and engine failure."[20]

59.     According to GM there are "two primary root causes, both of which are attributable to supplier manufacturing and quality issues: (1) rod-bearing damage from sediment on connecting rods and crankshaft-oil galleries; and (2) out of specification crankshaft dimensions and surface finish."[21] Consequently, GM warned drivers that "[i]f the engine fails during vehicle operation, the vehicle will lose propulsion, increasing the risk of a crash."[22]

60.     Common customer complaints relating to the Engine Defect are reports of engine seizures and connecting rods breaching engine blocks.

---

[20] Exhibit 12, https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25V274-1598.PDF (last visited June 12, 2025).
[21] *Id.*
[22] *Id.*

**D.    GM had pre-sale knowledge that the L87 Engines are dangerous and defective.**

61.    As noted above, the L87 Engines installed in the Class Vehicles contain a safety defect that results in vehicle stalls and the sudden loss of motive power, thereby increasing the risk of crashing and suffering injuries.

62.    GM had or should have had knowledge of the Defect, and the safety risk it poses to Class Vehicle drivers, passengers, and even bystanders, through several sources, including, but not limited to: (1) Defendant's pre-sale testing; (2) Defendant's own records of customer complaints; (3) repair records; (4) warranty and post-warranty claims and part sales; (5) GM's 2023 TechLink article concerning the L87 Engine; and (6) GM's history of defective engine components, including rod bearings, causing engine failures.

**1.    Defendant's Pre-Sale Testing and Quality Control Measures**

63.    GM is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Defendant conducts rigorous pre-sale tests to verify the parts are free from defects and align with their specifications.

64.    As part of the design and manufacturing process for the L87 Engine, GM performed a series of pre-production testing during "months of abuse"[23] and

---

[23] Exhibit 13, https://www.caranddriver.com/news/a15370188/how-the-24-hours-of-gm-chases-the-bugs-out-of-gms-performance-cars/ (last visited June 12, 2025).

"rigorous testing" to ensure that its vehicles meet its "renowned durability" standards.[24]

65.    GM has a "top secret automotive torcher chamber" in its "proving ground" which it "smash[es] or bash[es]" vehicles to ensure durability and safety prior to sale.[25] Among other things, GM puts its vehicles through extreme weather conditions, rough driving terrain, and speeds up to 150 mile per hour.[26]

66.    The design process for the L87 Engine in particular was so comprehensive that, according to Jordan Lee, Chevy's chief engineer for small block engines, it was equivalent to building an all-new engine.[27]

67.    GM states that its engine "undergoes a vigorous validation process that includes thousands of hours of real-world testing in some of the harshest environments."[28] GM claims that "[t]his 'tested-tough' process, coupled with our

---

[24] Exhibit 14, https://www.gm.com/company/gm-quality-standards (last visited June 12, 2025).

[25] https://www.youtube.com/watch?v=odeQa3hRvRk (last visited June 12, 2025).

[26] Exhibit 15, https://www.freep.com/story/money/cars/general-motors/2023/03/06/gm-milford-proving-ground-holds-many-secrets-here-are-some-fast-facts/69885649007/ (last visited June 12, 2025).

[27] Exhibit 11, https://www.detroitnews.com/story/business/autos/general-motors/2018/05/18/new-chevy-silverado-engines/35046583/ (last visited June 12, 2025).

[28] Exhibit 10, https://poweredsolutions.gm.com/products (last visited June 12, 2025).

use of the latest technology and state-of-the-art powertrain testing facilities, results in an exceptional product you can rely on."[29]

68.    On information and belief, GM performs quality control specifically relating to its bearings. For example, Chevrolet states that "GM Genuine Parts Engine Connecting Rod Bearing Pairs are ***designed, engineered, and tested*** to rigorous standards, and are backed by General Motors. GM Genuine Parts are the true OE parts installed during the production of or validated by General Motors for GM vehicles."[30]

69.    As a final set of testing before vehicles are sold to customers, GM puts "thousands of miles of wear and tear on every product."[31]

70.    Accordingly, based on its pre-sale testing of the relevant engine parts, GM was, and/or should have been aware of, the Defect.

### 2.    GM's March 2023 TechLink article

71.    On March 24, 2023, GM published an article on its TechLink website entitled "V8 Engine Crankshaft Bearing Conditions" for 2019-2023 Silverado, Sierra; 2021-2023 Tahoe, Suburban, Yukon and Escalade models equipped with L87 Engines.[32] Notably, the article was not distributed to Class Vehicle drivers.

---

[29] *Id.*

[30] Exhibit 16,  https://parts.chevrolet.com/product/gm-genuine-parts-engine-connecting-rod-bearing-set-19317286 (last visited June 12, 2025).

[31] Exhibit 14,  https://www.gm.com/company/gm-quality-standards (last visited June 12, 2025).

[32] Exhibit 17,  https://gm-techlink.com/?p=17349 (last visited June 12, 2025).

72.    In the article, GM warned that "[a] no crank condition may be found" in those vehicles.[33] GM revealed that "[t]he no crank condition may be due to a seized engine with an open starter fuse" which "may be the result of crankshaft bearing failure." Below is a picture provided in the article depicting the defective crankshaft bearing.



73.    The article further warns drivers that in cases involving suspected bearing failure, drivers should "check the engine oil and filter for excessive metal debris and bearing material." "If bearing material is identified, remove the engine oil pan and inspect the crankshaft rod and main bearings for any damage. Component replacement or, depending on the extent of damage, engine replacement may be necessary."

---

[33] *Id.*

74.     GM further warned that "[i]f the main bearing debris is sent through the oil galleries and other components that are in the lubrication circuit, which are very difficult to completely clean, it could lead to additional damage when installed on a new engine. When there is extensive damage, oil cooler, oil cooler line and oil tank replacement ensures all debris is completely removed and that any bearing failure debris is not transferred into the new service engine."

75.     Accordingly, by GM's own admission, it had knowledge of the Engine Defect, affecting L87 Engines prior to March 24, 2023.

### 3.     Defendant's monitoring of customer complaints, warranty claims, and lawsuits relating to the L87 Engine

76.     On information and belief, GM's customer relations divisions regularly receive and respond directly to customer calls concerning, *inter alia*, product defects and safety issues. Through these sources, Defendant was made aware of the Defect and had knowledge of its potential danger.

77.     On information and belief, GM's customer relations departments, which interact with authorized service technicians in order to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues, have received scores of reports of the Defect in Class Vehicles. Customer relations also collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have

reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

78.     GM's warranty departments similarly review and analyze warranty data submitted by their dealerships and authorized technicians in order to identify defect trends in their vehicles. Defendant dictates that when a repair is made under warranty (or warranty coverage is requested), service centers must provide GM with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in case GM later determines to audit the dealership or otherwise verify the warranty repair. For their part, service centers are meticulous about providing this detailed information about in-warranty repairs to Defendant because Defendant will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described.

79.     Upon information and belief, GM knew or should have known about the Defect because of the high number of complaints concerning the L87 Engine, stalling issues, and replacement L87 Engines ordered from Defendant. All GM service centers are required to order replacement parts, including L87 Engines directly from GM. Other independent vehicle repair shops that service Class Vehicles also order replacement parts directly from Defendant. GM routinely monitors part sales reports and is responsible for shipping parts requested by dealerships and technicians. Thus, GM has detailed, accurate, and real-time data

regarding the number and frequency of replacement part orders. The increase in orders of auto parts necessary to fix damage caused by the Defect in Class Vehicles was known to GM, and should have alerted it to the scope and severity of the Defect.

80.     On information and belief, the customer relations and warranty divisions of GM's brands interact with one another and discuss potential issues in all GM-branded vehicles which share components and designs.

81.     On information and belief, the engineering offices, safety offices, and safety investigators of GM's brands interact with one another and discuss potential issues in their vehicles which share components and designs.

82.     Defendant also regularly monitors the NHTSA databases as part of its ongoing obligation under the TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000), to identify potential defects in its vehicles. Among other employees, GM customer service departments are responsible for monitoring customer complaints posted to NHTSA's public database, as well as their respective websites or third-party websites.

83.     Scores of complaints submitted to NHTSA reveal the prevalence of the Engine Defect in vehicles equipped with L87 Engines and the magnitude of the Defect's impact on consumers.

84.     Below are just a few representative complaints filed with NHTSA detailing the Engine Defect found in Class Vehicles:

**February 25, 2023** NHTSA ID NUMBER: 11509063
### Components: ENGINE

**NHTSA ID Number:** 11509063

**Incident Date** December 2, 2022

**Consumer Location** Unknown

**Vehicle Identification Number** 1GYS4EKL1MR****

**Summary of Complaint**

| CRASH | No |
|---|---|
| FIRE | No |
| INJURIES | 0 |
| DEATHS | 0 |

As far as the findings from the diagnosis, the dealer advised that inspection found crank bearing failure. The engine has been ordered but does not have an ETA at this time.

**2 Affected Products** ▾

**Vehicles**

| MAKE | MODEL | YEAR |
|---|---|---|
| CADILLAC | ESCALADE | 2021 |

---

**August 1, 2022** NHTSA ID NUMBER: 11477035
### Components: POWER TRAIN, ENGINE

**NHTSA ID Number:** 11477035

**Incident Date** June 10, 2022

**Consumer Location** CORPUS CHRISTI, TX

**Vehicle Identification Number** 1GKS2JKL5MR****

**Summary of Complaint**

| CRASH | No |
|---|---|
| FIRE | No |
| INJURIES | 0 |
| DEATHS | 0 |

While traveling at highway speeds, the vehicle suddenly and without warning lost power. All gauges remained in the normal range. After pulling on to the shoulder of a highway and turning the vehicle off, the vehicle would not start. After being towed the dealership, the vehicle would not power up. Dealership checked DTCS and found code P0016 Crankshaft Position Sensor and Intake/Single Camshaft Position Sensor Correlation. Dealership inspected wiring for chaffing and tested camshaft position sensor circuitry and all found in normal condition. Dealership followed document ID: 5646662 diagnostic procedure inspecting camshaft position sensor and camshaft actuator solenoid valve for incorrect installation or damage. While inspecting, dealership found internal engine bearing material in oil indicating internal mechanical failure. Dealership removed engine oil pan and #1 and #2 connecting rods and found bearings spun causing catastrophic engine failure. Crankshaft main bearing cap #3 also found discolored from extreme heat. Dealership then followed bulletin #22-NA-074 for replacement of engine oil, cooler lines and engine oil cooler after connecting rod and main bearing damage The vehicle only had 17,067 miles.

**1 Affected Product** ▾

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| GMC | YUKON XL | 2021 |

April 11, 2023 NHTSA ID NUMBER: 11516616

October 3, 2023 NHTSA ID NUMBER: 11547936

## Components: POWER TRAIN

**NHTSA ID Number:** 11547936

**Incident Date** September 24, 2023

**Consumer Location** CARBONDALE, CO

**Vehicle Identification Number** 1GNSKSKL3PR****

**Summary of Complaint**

| CRASH | No |
|---|---|
| FIRE | No |
| INJURIES | 0 |
| DEATHS | 0 |

We have a chevy with the 6.2 V8 engine. First we were at a stop light on the highway and the car shifted into Neutral and would not come out for two light cycles. My wife and children were stuck at the light with car's swerving around them at 65+. Finally it shifted into Drive. We called the Chevy dealership and they said it would be a month before they could look at the car and there were no check engine warnings. Two days later my wife and family were driving down the highway and suddenly it started making a flapping sound from the engine bay and was losing power. She pulled over and turned off the vehicle to see if that changed anything. The car would not restart and the check engine light was on (solid not flashing) it would just try to turn over with no success. We had it flat bed towed to the chevy dealership where they told us the engine was blown and that it had thrown a rod. We have 3900 miles on the vehicle and I would say this is a significant safety issue given that it can disable the vehicle on a busy highway.

**1 Affected Product** -

### Vehicle

| MAKE | MODEL | YEAR |
|---|---|---|
| CHEVROLET | TAHOE | 2023 |

/

/

/

/

/

/

/

27

February 20, 2024 NHTSA ID NUMBER: 11573012

⊖

**Components: ENGINE**

**NHTSA ID Number:** 11573012

**Incident Date** January 9, 2024

**Consumer Location** CITY OF INDUSTRY, CA

**Vehicle Identification Number** 1GYS4RKLXPR****

**Summary of Complaint**

| CRASH | No |
|---|---|
| FIRE | No |
| INJURIES | 0 |
| DEATHS | 0 |

1. 01/09/2024 engine failure on freeway No warning, no noise, just all of sudden 2. Pull back to Dealership One day later, they said engine would need to REPLACE, and saying they have engine in stock and can replace IMMD. *** Crestview Cadillac 3. Bodyshop mentioned 4 same type of vehicle has the same issue 4. I talked to CS with Cadillac, but they turned down the buy back 5. Then I submitted the complaint to BBB Autoline, they JUST called me today saying they won't able to buy back Instead of offer some Cadillac point. *** I refused, I told her this is beyond normal, and Cadillac is aware safety issue on this engine. The rep said they did the recall last year, but I explained to her that even worse, after fixing the safety issue still existed I am lucky the engine failure was on sunny day, imagine it was in raining day I already dead.

1 Affected Product ⁃

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| CADILLAC | ESCALADE ESV | 2023 |

December 27, 2023 NHTSA ID NUMBER: 11562182

⊖

**Components: ENGINE**

**NHTSA ID Number:** 11562182

**Incident Date** December 27, 2023

**Consumer Location** PELHAM, NH

**Vehicle Identification Number** 1GNSKRKL8PR****

**Summary of Complaint**

| CRASH | No |
|---|---|
| FIRE | No |
| INJURIES | 0 |
| DEATHS | 0 |

Car completely died. Engine spun a bearing at 10, 000 miles.

1 Affected Product ⁃

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| CHEVROLET | TAHOE | 2023 |

28

**August 17, 2023** NHTSA ID NUMBER: 11539181

**Components: ENGINE**

**NHTSA ID Number:** 11539181

**Incident Date** August 4, 2023

**Consumer Location** JARRETTSVILLE, MD

**Vehicle Identification Number** 1GKS2HKL9NR****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | Vehicle stopped dead in road while driving on highway. Vehicle unable to shift into park, neautral or drive once engine ceased. 19,000 miles and 1 year of ownership, oil change and service at GM dealer less than 1 month prior to engine failure. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**1 Affected Product -**

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| GMC | YUKON XL | 2022 |

**August 28, 2023** NHTSA ID NUMBER: 11541111

**Components: ENGINE**

**NHTSA ID Number:** 11541111

**Incident Date** July 24, 2023

**Consumer Location** ANDOVER, MA

**Vehicle Identification Number** 1GYS4KKL9PR****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | The contact owns a 2023 Cadillac Escalade ESV. The contact stated that while driving approximately 55 MPH, the vehicle stalled. There were no warning lights illuminated. The vehicle was towed to the local dealer, where it was diagnosed that a software update was needed. The vehicle was repaired, but the failure recurred. The vehicle was taken back to the local dealer, where it was diagnosed, and it was determined that the engine needed to be replaced. The vehicle was not repaired. The manufacturer was contacted but provided no assistance. The failure mileage was approximately 700. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**1 Affected Product -**

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| CADILLAC | ESCALADE ESV | 2023 |

29

March 7, 2024 NHTSA ID NUMBER: 11576083

**Components: ENGINE**

**NHTSA ID Number:** 11576083

**Incident Date** March 5, 2024

**Consumer Location** BOURBONNAIS, IL

**Vehicle Identification Number** 1GNSKTKL7PR****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | 2023 Tahoe High Country was being operated at Interstate speeds when the vehicle shifted to neutral, engine died and the vehicle experienced a rapid decrease in speed. Check engine light activated as well as dashboard lights. Was able to guide vehicle to side of road. Unable to start vehicle and was towed to local dealership. Learned the engine was blown as well as a large 20amp fuse. I am an expert in traffic crash reconstruction and this type of incident could lead to serious injury or death. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**1 Affected Product** -

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| CHEVROLET | TAHOE | 2023 |

March 30, 2024 NHTSA ID NUMBER: 11580224

**Components: ENGINE**

**NHTSA ID Number:** 11580224

**Incident Date** March 29, 2024

**Consumer Location** Unknown

**Vehicle Identification Number** 1GKS2DKL0MR****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | Total engine failure due to bearing issues in the bottom half of the engine. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**1 Affected Product** -

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| GMC | YUKON | 2021 |

July 23, 2023 NHTSA ID NUMBER: 11533961 

## Components: POWER TRAIN, ENGINE, FUEL/PROPULSION SYSTEM

**NHTSA ID Number:** 11533961

**Incident Date** April 29, 2023

**Consumer Location** MONTICELLO, WI

**Vehicle Identification Number** 1GYS4DKL8PR****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | INCIDENT: I was driving on the highway when I heard a strange "whistling noise." Thinking the noise originated from an old van in front of me, I passed it. The noise grew louder; the vehicle slowed very suddenly and, I pulled to the side of the road. The "low oil pressure" light came on just as the engine entirely blew. There were NO OTHER WARNING LAMPS, MESSAGES or OTHER SYMPTOMS. On-Star did not send roadside assistance for six hours and the battery died from extended use of the emergency lights. DANGERS: Experiencing catastrophic engine failure while driving on a highway presents obvious dangers as does sitting roadside for six hours (with a dead battery and no emergency flashers). INSPECTION: The G.M. Dealer (manufacturer representative) inspected the engine and confirmed that it was a catastrophic engine failure, requiring a new engine. The issue was also reported directly to G.M. The engine core, if need of further inspection, is likely either at the dealer, G.M., or a GM remanufacturing facility. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

**1 Affected Product -**

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| CADILLAC | ESCALADE | 2023 |

/

/

/

/

/

/

/

31



June 3, 2024 NHTSA ID NUMBER: 11592274

**Components: ENGINE**

**NHTSA ID Number:** 11592274

**Incident Date** May 24, 2024

**Consumer Location** SCHERTZ, TX

**Vehicle Identification Number** 3GTP9EED2MG****

**Summary of Complaint**

| | | |
|---|---|---|
| CRASH | No | The contact owns a 2021 GMC Sierra 1500. The contact stated that while driving at an undisclosed speed, the vehicle failed to accelerate as needed and made an abnormal sound. The contact assumed that the sound was coming from the transmission and the vehicle was taken to a dealer. The dealer diagnosed the vehicle and suggested that the failure might be a pulley or a rod bearing failure. The contact took the vehicle to another dealer who confirmed a rod bearing failure. The manufacturer was not made aware of the failure. The vehicle was not repaired. The failure mileage was approximately 46,000. |
| FIRE | No | |
| INJURIES | 0 | |
| DEATHS | 0 | |

1 Affected Product -

**Vehicle**

| MAKE | MODEL | YEAR |
|---|---|---|
| GMC | SIERRA 1500 | 2021 |

85.    Upon information and belief, consumers who submitted a complaint to NHTSA also took their Class Vehicles to GM dealers prior to submitting their complaints to NHTSA, and the dealers reported the issues to GM.

86.    Likewise, complaints of the Engine Defect are found on third-party websites dedicated to Class Vehicles.

87.    For example, in April 2023, on *silveradosierra.com*, an online message board "dedicated to Chevrolet Silverado and GMC Sierra pickup owners and enthusiasts," Class Members were publicly complaining under a post titled: "6.2

32

Main Bearing Fail."[34] Therein, the owner of a 2022 Sierra 1500 Denali Crew Cab with the L87 Engine complained that their vehicle with 8,200 miles "Started with a slight engine rattle/knock one evening. Did some research and thought it was lifters. Took it into dealership the very next morning, driving there it was starting to squeal and knock pretty loud. Dealership called me a few hours later. As they drove it into the bay, engine locked up. Dropped the oil pan and the main bearing cover had 'Grenade-ed'. Totally replacement of engine, oil pump and radiator. bad thing is they are searching for a engine. Said the last engine they had to replace was a 5.3 and it took them 4 months to get it in." Another person responded: "I am going through the same problem with my 6.2 trail boss. Very frustrating to say the least."

88.     Most surprising of all, one person commented that they had "just settled a lawsuit against GM for three 6.2 in less than two years and 25k miles. Same thing happened to them. Good luck I feel your pain."[35] Another customer complained that after the GM dealership diagnosed an engine failure in their 2023 GMC Sierra AT4: "GM is denying the warranty without even tearing the motor apart. GM offered me $2000 to help with the repairs as a customer loyalty incentive. Going after them through lemon law with BBBautoline."  Thus, GM not only had knowledge of the

---

[34] Exhibit 18,  https://www.silveradosierra.com/threads/6-2-main-bearing-fail.752695/?post_id=7382030&nested_view=1&sortby=oldest#post-7382030 (last visited June 12, 2025).
[35] *Id.*

Defect through customer complaints, GM was put on notice through lawsuits and claims for arbitration brought against it for the same issue.

89.    In September 2024, Class Members posted in the "gmcsierra" reddit message board complaining about the Engine Defect.[36] Specifically, the owner of a 2024 GMC Sierra Denali complained about his L87 Engine stalling while driving:

> I have a 2024 Sierra Denali truck with a 6.2L EcoTec3 engine. Twice while driving it, the engine stopped and the dash display said to the push start button to restart it, once while at a stop light and the other while in motion. Luckily, after the second failure, I was able to coast into a shopping center parking lot before stopping. It never restarted. I had a tow truck take it to the nearest GMC service center. After two days, a service rep called and said they have to replace the engine. He said the "bearings seized up". I am wondering if this problem is a prevalent issue for the L87 engines. The service rep said he has had several engines with this problem and their dealership/service center is located in a small East Texas town. Has anyone else had this problem? The truck only has 4,400 miles on it.

90.    In response to this owner's complaint, an employee at GM dealership commented that this is a known issue:[37]

> Yes this is a very common issue with the '23/24 model year 6.2s. It's a quality control issue that unfortunately is persisting.
>
> ***I'm the PM of a smaller GMC store*** and I'm stocking these engines at this point to get customers back into their

---

[36] Exhibit 19, https://www.reddit.com/r/gmcsierra/comments/1fm1ypy/l87_62l_engine_bearing_failure/ (last visited June 12, 2025).

[37] *Id.*

> trucks faster instead of diag/approval/order/week+ to
> receive because GM keeps them all in Michigan.

The same employee responded later in the message board that "I'd avoid 6.2s right now."

91.    Another Class Vehicle owner complained that they "had 2 failures now in my 2021 Sierra Denali 6.2L. The first failure came at 19,000 miles and the second 2 weeks ago with only 61k on that motor. Both engines seized while driving. Its a serious problem."

92.    On information and belief, GM reviews third-party websites, including those dedicated to their vehicles, in order to monitor potential defects in their vehicles and to provide feedback to consumer complaints.

### 4.    GM has a history of engine bearing defects affecting its vehicles

93.    Rod bearing failures, resulting in catastrophic engine failures, is a well-known safety risk in the automotive industry—and one that GM has extensive knowledge of.

94.    In 2013, GM disclosed that its 2013-2014 Chevrolet Malibu, 2014 Chevrolet Impala, 2014 Buick Regal, 2013-2014 Cadillac ATS, and 2014 Cadillac CTS vehicles were installed with faulty connecting rod bearings that can cause

engine failures after just a few thousand miles.[38] GM warned that "the flawed bearings can disrupt the oil film between the bearing and the crankshaft, leading to catastrophic metal-on-metal contact."[39] In this same *Car and Driver* article discussing GM's revealed defect, the automotive publication warned that the consequence of the defect "is a spun rod bearing that scores the crankshaft and introduces metal shavings into the oil supply. While it's possible to salvage an engine with a spun rod bearing, the difficulty of matching the original tolerances means it's far more common to replace the engine."[40]

95.     Given its experience with faulty engine bearings, GM did, or should have, performed diligent presale testing and post-sale monitoring for similar defects within the Class Vehicles.

### E.     Despite admitting the existence of the Defect, GM refuses to offer an adequate remedy

96.     On April 24, 2025, GM announced that it was issuing a safety recall campaign for all Class Vehicles due to the Defect. Specifically, GM announced that it was recalling certain 2021-2024 Cadillac Escalade and Escalade ESV, Chevrolet Silverado 1500, Suburban, and Tahoe, GMC Sierra 1500, Yukon, and Yukon XL

---

[38]  Exhibit 20, https://www.caranddriver.com/news/a15368085/maliboom-faulty-connecting-rod-bearing-causing-engine-failures-in-gm-four-cylinders/ (last visited June 12, 2025).
[39] *Id.*
[40] *Id.*

vehicles equipped with a 6.2L V8 gas engine due to a defect that causes Engine damage and engine failure.

97. In its Recall Report, GM described the "Defect," "Safety Risk," and "Cause":[41]

> Description of the Defect: General Motors has decided that a defect which relates to motor vehicle safety may exist in certain 2021 – 2024 model year Cadillac Escalade and Escalade ESV, Chevrolet Silverado 1500, Suburban, and Tahoe, and GMC Sierra 1500, Yukon, and Yukon XL vehicles equipped with the 6.2L V8 gas engine (RPO L87). The connecting rod and/or crankshaft engine components in these vehicles may have manufacturing defects that can lead to engine damage and engine failure.

> Description of the Safety Risk: If the engine fails during vehicle operation, the vehicle will lose propulsion, increasing the risk of a crash.

> Description of the Cause: Engine teardown analysis identified two primary root causes, both of which are attributable to supplier manufacturing and quality issues: (1) rod-bearing damage from sediment on connecting rods and crankshaft-oil galleries; and (2) out of specification crankshaft dimensions and surface finish.

98. According to a filing submitted by KA to NHTSA in connection with the Recall, "GM's investigation identified 28,102 field complaints or incidents in the US potentially related to failure of the L87 engine due to crankshaft, connecting rod, or engine bearing failure, of which 14,332 involved allegations of loss of

---

[41] Exhibit 12, https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25V274-1598.PDF (last visited June 12, 2025).

propulsion. These field complaints were received between April 29, 2021, and February 3, 2025." GM further revealed that it "identified 12 potentially related alleged crashes and 12 potentially related alleged injuries in the U.S." and "42 potentially related fire allegations in the U.S."

99.     Despite acknowledging the seriousness of the Defect affecting Class vehicles, the company's "remedy" fails to be what it purports to be—an actual "remedy." Rather, GM will instruct dealers to "inspect and, as necessary, repair or replace the engine. Vehicles that pass inspection will be provided a higher viscosity oil, which will also require a new oil fill cap, an oil filter replacement, and an owner's manual insert."

100.   This remedy is ineffective and deficient for several reasons.

101.   In its April 2025 Technical Service Bulletin ("TSB") to its authorized dealerships, GM instructed its dealers to inspect the vehicles for diagnostic trouble code ("DTC") P0016, which indicates misalignment between the camshaft and crankshaft.[42]

102.   If the Class Vehicle does not show this DTC, GM instructed dealers to replace the factory fill oil (0W-20) for a higher viscosity oil (0W-40), replace the oil cap with one that is marked to indicate the higher viscosity oil is now required, and

---

[42] Exhibit 21, https://static.nhtsa.gov/odi/rcl/2025/RCRIT-25V274-8641.pdf (last visited June 12, 2025).

replace the oil filters on those vehicles passing this inspection. But inserting a higher viscosity oil does nothing to remedy the out of specification crankshaft dimensions and surface finish.

103.   For the Class Vehicles inspected and presenting the DTC P0016, the April 2025 TSB fails to offer even a putative "remedy" and merely tells dealers to await further instructions—leaving Class Vehicle drivers in the lurch, waiting for a catastrophic incident.

104.   GM's May 1, 2025 TSB addressing replacement engines fares no better.[43] First, it only applies to a limited subset of Class Vehicles, and not even all vehicles that suffered an engine failure. Second, even the limited subset of Class Vehicles subject to the TSB are not offered an actual remedy because simply replacing the defective L87 Engine with the same type of engine does not address the Engine Defect. All this does is leave consumers with the same defective engine and at risk of the same safety risk of crashing. Indeed, consumers have reported that the replaced L87 Engines have experienced the same catastrophic failures as the ones initially installed in their Class Vehicles.

---

[43] Exhibit 22, https://static.nhtsa.gov/odi/rcl/2025/RCRIT-25V274-5347.pdf (last visited June 12, 2025).

## F.      Fraudulent Omission/Concealment Allegations

105.    Absent   discovery,   Plaintiff   is   unaware   of,   and   unable   through
reasonable investigation to obtain, the true names and identities of those individuals,
employed by Defendant, responsible for making false and misleading statements
regarding the Class Vehicles. Defendant necessarily is in possession of all of this
information.    Plaintiff's    claims    arise    out    of    Defendant's    fraudulent
omission/concealment of the Defect, despite its representations about the quality,
reliability, and safety of the Class Vehicles.

106.    Plaintiff alleges that at all relevant times, including specifically at the
time he and Class Members purchased their Class Vehicles, Defendant knew, or
were reckless in not knowing, of the Defect; Defendant had a duty to disclose the
Defect based upon its exclusive knowledge; and Defendant never disclosed the
Defect to Plaintiff or the public at any time or place in any manner prior to the 2025
Recall.

107.    Plaintiff makes the following specific concealment/omission-based
allegations with as much specificity as possible absent access to the information
necessarily available only to Defendant:

108.    *Who*: GM actively concealed and omitted the Defect from Plaintiff and
Class Members while simultaneously touting the quality, safety, and dependability
of the Class Vehicles, as alleged herein. Plaintiff is unaware of, and therefore unable

to identify, the true names and identities of those specific individuals responsible for such decisions.

109. *What*: that the Class Vehicles contain the Defect, as alleged herein. Defendant concealed and omitted the Defect while making representations about the safety, dependability, and other attributes of the Class Vehicles, as alleged herein.

110. *When*: Defendant concealed and omitted material information regarding the Defect at all times while making representations about the quality, safety, and dependability of the Class Vehicles on an ongoing basis, and continuing to this day. And when consumers brought their vehicles to GM dealerships or called Defendant's respective customer service and warranty departments complaining of the Defect, Defendant denied an adequate repair for the Defect and warranty coverage.

111. *Where*: Defendant concealed and omitted material information regarding the true nature of the Defect in every communication they had with Plaintiff and Class Members, and made representations about the quality, reliability, and safety of the Class Vehicles. Plaintiff is aware of no document, communication, or other place or thing, in which Defendant disclosed the truth about the full scope of the Defect in the Class Vehicles prior to the 2025 Recall. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on Defendant's websites. There are channels through which

Defendant could have disclosed the Defect, including, but not limited to: (1) point of sale communications; (2) the owner's manual; and/or (3) direct communication to Class Members through means such as state vehicle registry lists and e-mail notifications.

112.  **How**: Defendant concealed and omitted the Defect from Plaintiff and Class Members and made representations about the quality, safety, and dependability of the Class Vehicles. Defendant actively concealed and omitted the truth about the existence, scope, and nature of the Defect from Plaintiff and Class Members at all times, even though it knew about the Defect and knew that information about the Defect would be important to a reasonable consumer, and Defendant promised in its marketing materials that Class Vehicles have qualities that they do not have.

113.  **Why**: Defendant actively concealed and omitted material information about the Defect in the Class Vehicles for the purpose of inducing Plaintiff and Class Members to purchase and/or lease Class Vehicles, rather than purchasing or leasing competitors' vehicles, and made representations about the quality, safety, and durability of the Class Vehicles. Had Defendant disclosed the truth, for example, in its advertisements or other materials or communications, Plaintiff and Class Members (all reasonable consumers) would have been aware of it, and would not have bought or leased the Class Vehicles or would not have paid as much for them.

42

## V.    TOLLING OF STATUTES OF LIMITATIONS

114.    Any applicable statute(s) of limitations have been tolled by GM's knowing and active concealment and denial of the facts alleged herein. Plaintiff and the members of the Class could not have reasonably discovered the true nature of the Defect because Defendant concealed it.   Plaintiff's claims were thus tolled pursuant to the discovery rule, for fraudulent concealment, and for estoppel.

### A. Discovery Rule

115.    The causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that their Class Vehicles contained the Defect.

116.    As alleged above, Class Members had no way of knowing about the Defect in their Class Vehicles. GM concealed its knowledge of the Defect while GM continued to market and sell the Class Vehicles as safe, secure, high-quality, and reliable vehicles.

117.    Within any applicable statutes of limitation, Class Members could not have discovered through the exercise of reasonable diligence that GM was concealing the conduct complained of herein and misrepresenting the true qualities of the Class Vehicles.

118.    Class Members did not know facts that would have caused a reasonable person to suspect that there was a Defect affecting their vehicle and an ordinary person would be unable to appreciate that the vehicle was defective. Indeed, even

after Class Members contacted GM and its authorized dealers for vehicle repairs concerning the Defect, they were routinely told by Defendant and/or through its dealers that the Class Vehicles were not defective and/or they were offered a "remedy" that fails to address the Engine Defect. As described above, the true cause of the engine failures in the Class Vehicles is a defect caused by the defective design and/or manufacturing of L87 Engines and the purported remedies do not address the actual causes of the Defect.

119. For ordinary consumers, the existence and partial extent of the Defect only came to light after GM issued the 2025 Recall.

120. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to the claims in this litigation.

**B.    Fraudulent Concealment**

121. As the manufacturer, distributor, seller, and/or warrantor of the Class Vehicles, GM was under a continuous duty to disclose to Class Members the existence of the Defect found in the Class Vehicles.

122. Defendant was and remains under a continuing duty to disclose to Plaintiff and the Members of the Class the true character, quality, and nature of the Class Vehicles, that the Defect found in the Class Vehicles will result in catastrophic engine failure, among other safety risks, that they will require costly repairs, pose

safety concerns, cause damage to their personal property, and diminish the resale value of the Class Vehicles.

123.  GM recklessly disregarded the true nature, quality, and character of the Class Vehicles, by failing to disclose the existence of the Defect.

124.  Due to Defendant's concealment throughout the time period relevant to this action, all applicable statutes of limitation have been tolled.

125.  Instead of publicly disclosing the Defect in the Class Vehicles, Defendant kept owners and lessees in the dark about the Defect present in their vehicles.

126.  Class Members were not at fault for failing to discover the existence of the Defect present in their Class Vehicles.

127.  Until he experienced catastrophic engine failure while on the road and the 2025 Recall was issued, Plaintiff had no actual or presumptive knowledge of facts sufficient to put him on inquiry notice of such a connection. In particular, Class Members did not possess the aggregate data concerning L87 Engine failures or the technical data related to the design and manufacturing of the Class Vehicles.

128.  This ignorance of the existence of the Defect present in the Class Vehicles is common across each Plaintiff and Class Member.

### C.    Estoppel

129.   GM was, and is, under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the Class Vehicles. GM failed to disclose the existence of the Defect and actively concealed the true character, quality, and nature of the Class Vehicles while knowingly making representations about the quality and reliability of the Vehicles. Plaintiff and Class Members reasonably relied upon GM's knowing and affirmative representations and/or active concealment of these facts. Based on the foregoing, GM is estopped from relying on any statutes of limitation in defense of this action.

## VI.   CLASS ALLEGATIONS

130.   Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all others similarly situated.

131.   Plaintiff seeks to represent a class ("Nationwide Class") defined as:

> All persons or entities that purchased or leased a Class Vehicle in the United States.

132.   In addition, and in the alternative to the Nationwide Class, Plaintiff seeks to represent the following State Class:

> Illinois Class:
>
> All persons or entities that purchased or leased a Class Vehicle in the State of Illinois.

133.   The Nationwide Class and the State Class are collectively referred to herein as the Classes.

134.   Excluded from the Classes are Defendant, its affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change, or expand the Classes' definitions based on discovery and further investigation.

135.   <u>Numerosity</u>: Upon information and belief, the Classes are so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Classes are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that at least eight hundred thousand Class Vehicles have been sold and leased in the United States.

136.   <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Classes. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

    a. Whether Defendant engaged in the conduct alleged herein;

    b. Whether Defendant designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

c. Whether the Class Vehicles were sold with a safety defect;

d. Whether Defendant knew of the Defect but failed to disclose the problem and its consequences to its customers;

e. Whether a reasonable consumer would consider the Defect or its consequences to be material;

f. Whether Defendant breached implied warranties with respect to the Defect;

g. When Defendant discovered the Defect in the Class Vehicles, and what, if anything, it did in response;

h. Whether Defendant should be required to disclose the existence of the Defect;

i. Whether Defendant's conduct violates the consumer protection statutes asserted herein;

j. Whether Plaintiff and Class Members overpaid for their Class Vehicles; and

k. Whether Plaintiff and Class Members experienced out-of-pocket losses as a result of the Defect, and if so, how much.

137.   Typicality: Plaintiff's claims are typical of the claims of the Classes because Plaintiff purchased a Class Vehicle with the same Defect as did each member of the Classes. Furthermore, Plaintiff and all Members of the Classes sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendant's wrongful conduct. Plaintiff is advancing the same claims and legal theories on behalf of himself and all absent Class Members.

138.   Adequacy: Plaintiff is an adequate representative because his interests do not conflict with the interests of the Classes that he seeks to represent, he has

retained counsel competent and highly experienced in complex class action litigation, and he intends to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiff and his counsel.

139. <u>Superiority</u>: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and Members of the Classes. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for Members of the Classes individually to redress effectively the wrongs done to them. Even if the Members of the Classes could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendant's vehicle identification numbers, warranty claims, registration records, and database of complaints.

140.   Defendant has acted, and refused to act, on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

## VII. CAUSES OF ACTION

### COUNT I: VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq*.)
### (On Behalf of the Nationwide Class)

141.   Plaintiff incorporates by reference every allegation set forth in preceding paragraphs as if fully stated herein.

142.   Plaintiff brings this claim on behalf of himself and the Nationwide Class.

143.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

144.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiff and Nationwide Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

145.   GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

146.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

147.   GM provided Plaintiff and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of its vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, GM warranted that the Class Vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

148.   GM breached its implied warranties, as described herein, and is therefore liable to Plaintiff under 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles all suffer from the common Engine Defect, which creates an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Class Vehicles. The Engine Defect rendered the Class Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

149.   As discussed herein, on information and belief, GM knew or should have known about the Engine Defect prior to sale based upon, among other facts: (1) Defendant's pre-sale testing; (2) Defendant's own records of customer complaints; (3) dealership repair records; (4) warranty and post-warranty claims and part sales; (5) GM's 2023 TechLink article concerning the L87 Engine; and (6)

GM's history of defective engine components, including rod bearings, causing engine failures.

150.   GM omitted information about the Engine Defect and its consequences from Plaintiff and Class members, misrepresented the qualities of the Class Vehicles, and has failed to provide a fix for the Defect.

151.   Any effort by GM to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

152.   Any limitations GM might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between GM and Plaintiff, because, at the time of purchase and lease, Plaintiff had no other options for purchasing warranty coverage other than directly from GM.

153.   Any limitations GM might seek to impose on its warranties are substantively unconscionable. GM knew or should have known that the Class Vehicles were defective and that the Class Vehicles suffered from a safety defect and placed drivers at risk when used as intended long before Plaintiff and Class members knew or should have known. GM failed to disclose this defect to Plaintiff and Class members. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

154.   Plaintiff and other Class members have had sufficient direct dealings with Defendant to establish privity of contract between Defendant on one hand, and Plaintiff and each of the other Class members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between Defendant and their dealers, and specifically, of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Defendant was also aware that the ultimate consumers of the Class Vehicles (*i.e.*, the Class) required vehicles that would function safely, could be relied upon, and otherwise meet minimum industry standards. Additionally, privity is excused here because Plaintiff and each of the other Class members relied on statements made by Defendant itself in choosing to purchase or lease a Class Vehicle. As alleged herein, the marketing of the Class Vehicles was uniform, and was controlled and disseminated directly by Defendant.

155.   Under 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this class action and is not required to give GM notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff under Rule 23 of the Federal Rules of Civil Procedure.

156. Plaintiff would suffer economic hardship if he returned his Class Vehicle but did not receive the return of all payments made by him. Because GM will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiff has not re-accepted his Class Vehicle by retaining it.

157. The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed based on all claims to be determined in this lawsuit. Plaintiff, individually and on behalf of all other Nationwide Class members, seeks all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial. In addition, under 15 U.S.C. § 2310(d)(2), Plaintiff is entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiff and Nationwide Class members in connection with the commencement and prosecution of this action.

158. Plaintiff also seeks the establishment of a GM-funded program for Plaintiff and Nationwide Class members to recover out-of-pocket costs incurred in attempting to rectify and mitigate the effects of the Engine Defect in their Class Vehicles.

## COUNT II: UNJUST ENRICHMENT
### (On Behalf of the Nationwide Class or,
### Alternatively, on Behalf of the Illinois Class)

159.   Plaintiff incorporates by reference the Substantive Allegations set forth in § IV above as if fully stated herein.

160.   Plaintiff pleads this claim separately as well as in the alternative to his claims for damages under Fed. R. Civ. P. 8(a)(3).

161.   Plaintiff brings this claim on behalf of himself and the Nationwide Class under the common law of unjust enrichment, which is materially uniform in all states. In the alternative, Plaintiff brings this claim on behalf of each of the Illinois Classes under the laws of Illinois.

162.   Defendant designed, manufactured, produced, distributed, marketed, and/or sold the Class Vehicles during the relevant period herein.

163.   Plaintiff and members of the Classes conferred non-gratuitous benefits upon Defendant, without knowledge that the Class Vehicles contained the Engine Defect.

164.   Defendant appreciated, or had knowledge of, the non-gratuitous benefits conferred upon them by Plaintiff and members of the Classes.

165.   Defendant accepted or retained the non-gratuitous benefits conferred by Plaintiff and members of the Classes, with full knowledge and awareness that, as a result of Defendant's unconscionable wrongdoing, Plaintiff and members of the

Classes were not receiving products of high quality, nature, fitness, or value that had been represented by Defendant and reasonable consumers would have expected.

166.    Retaining the non-gratuitous benefits conferred upon Defendant by Plaintiff and members of the Classes under these circumstances made Defendant's retention of the non-gratuitous benefits unjust and inequitable.

167.    Because Defendant's retention of the non-gratuitous benefits conferred by Plaintiff and members of the Classes is unjust and inequitable, Plaintiff and members of the Classes are entitled to, and hereby seek, disgorgement and restitution of Defendant's wrongful profits, revenue, and benefits in a manner established by the Court.

**COUNT III: FRAUDULENT CONCEALMENT**
**(On Behalf of the Nationwide Class or,**
**Alternatively, on Behalf of the Illinois Class)**

168.    Plaintiff incorporates by reference every allegation set forth in preceding paragraphs as if fully stated herein.

169.    Plaintiff brings this claim on behalf of himself and the Nationwide Class under the common law of fraudulent concealment, which is materially uniform in all states. In the alternative, Plaintiff brings this claim on behalf of the Illinois Classes under the laws of Illinois.

170.    GM fraudulently concealed and suppressed material facts concerning the quality of the Class Vehicles and the existence of the Defect.

171.    Despite advertising the Class Vehicles as safe, reliable, and being of high quality, GM knew when it manufactured, marketed, and sold or leased the Class Vehicles that the Class Vehicles suffered from a design and/or manufacturing defect that reduced the Class Vehicles' value and subjected the Class Vehicles to the risk of stalling while driving and that rendered the Class Vehicles unreliable and posed significant safety hazards to drivers.

172.    GM failed to disclose these facts to consumers at the time it manufactured, marketed, and sold or leased the Class Vehicles, and GM knowingly and intentionally engaged in this concealment in order to boost sales and revenue, maintain its competitive edge in the automobile market, and obtain windfall profits. Through its active concealment and/or suppression of these material facts, GM sought to increase consumer confidence in the Class Vehicles, and to falsely assure purchasers and lessors of the same that the Vehicles were of sound quality and that GM was a reputable manufacturer that stands behind the automobiles it manufactures. GM engaged in this behavior to protect its profits, avoid warranty replacements, avoid recalls that would impair the brand's image, cost it money, and undermine its competitiveness in the automobile industry.

173.    Plaintiff and Class members were unaware, and could not reasonably discover on their own, that GM's representations were false and misleading, or that it had omitted material facts relating to the Class Vehicles.

174.    GM had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Defect because:

(a)    GM had exclusive or far superior knowledge of the Defect and concealment thereof;

(b)    the facts regarding the Defect and concealment thereof were known and/or accessible only to GM;

(c)    GM knew that Plaintiff and Class members did not know about, or could not reasonably discover, the Defect and concealment thereof; and

(d)    GM made representations and assurances about the qualities of the Class Vehicles, and about the existence of a repair for the Defect that were misleading, deceptive, and incomplete without the disclosure of the fact that the Class Vehicles suffered from a latent and inherent design and/or manufacturing defect.

175.    These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase or lease the Class Vehicles, and because they substantially reduced the value of the Class Vehicles purchased or leased by Plaintiff and Class members. Whether the Class Vehicles were defective, of sound quality, safe, reliable, and whether GM stood behind such Vehicles would have been an important factor in Plaintiff's and the Class members' decisions to purchase or lease the Vehicles. Plaintiff and Class members trusted GM not to sell them vehicles that were defective and significantly overpriced.

176.    GM intentionally and actively concealed and suppressed these material facts to falsely assure consumers that their Class Vehicles were free from known defects, as represented by GM and reasonably expected by consumers.

177.   Plaintiff and Class members were unaware of these omitted material facts and would have paid less for the Class Vehicles, or would not have purchased/leased them at all, if they had known of the concealed and suppressed facts. Plaintiff and Class members did not receive the benefit of their bargain due to GM's fraudulent concealment. Plaintiff's and Class members' actions in purchasing the Class Vehicles were justified. GM was in exclusive control of the material facts, and such facts were not known or reasonably knowable to the public, Plaintiff, or Class members.

178.   Plaintiff and Class members relied to their detriment upon GM's reputation, fraudulent misrepresentations, and material omissions regarding the quality, safety, and reliability of the Class Vehicles.

179.   As a direct and proximate result of GM's deceit and fraudulent concealment, including its intentional suppression of true facts, Plaintiff and Class members suffered injury. They purchased and leased Class Vehicles that had a diminished value by reason of GM's concealment of, and failure to disclose, the Defect.

180.   Accordingly, GM is liable to the Nationwide Class and/or Illinois Class for their damages in an amount to be proven at trial.

181.   On information and belief, GM has still not made full and adequate disclosure and continues to defraud Plaintiff and Class members. GM also continues to conceal material information regarding the Defect.

182.   GM's acts were done deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class members' rights. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT IV: STRICT PRODUCT LIABILITY
#### (On Behalf of the Nationwide Class or,
#### Alternatively, on Behalf of the Illinois Class)

183.   Plaintiff incorporates by reference every allegation set forth in preceding paragraphs as if fully stated herein.

184.   Plaintiff brings this claim on behalf of himself and the Nationwide Class under the common law of fraudulent concealment, which is materially uniform in all states. In the alternative, Plaintiff brings this claim on behalf of the Illinois Class under the laws of Illinois.

185.   By placing an unreasonably dangerous product in the stream of commerce, Defendant is strictly liable.

186.   Defendant is strictly liable for designing, engineering, testing, validating, manufacturing, marketing, and placing in the stream of commerce the

Class Vehicles which are unreasonably dangerous and defective due to the Engine Defect.

187.    Defendant designed, engineered, tested, validated, manufactured, marketed, and placed in the stream of commerce the Class Vehicles which are unreasonably dangerous and defective due to the Engine Defect.

188.    The Class Vehicles and L87 Engines installed therein are being used in an intended and/or foreseeable manner. Plaintiff and Class Members have not misused or materially altered the Class Vehicles or the L87 Engines. The Class Vehicles and L87 Engines are in the same or substantially similar condition as they were at the time of purchase or lease.

189.    The Class Vehicles and L87 Engines are unreasonably dangerous and defective because they were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce with the Defect that can cause Class Vehicles to suddenly and unexpectedly experience catastrophic engine failure.

190.    The Defect causes an unreasonably dangerous condition when Class Vehicles are used for their intended and foreseeable purpose of providing safe and reliable transportation and places Plaintiff, Class Members, and others on the road at an unreasonable and substantial risk for injury or death.

191.    Defendant was aware of feasible alternative designs which would minimize or eliminate the Defect and the risk it poses. Such alternative designs were

known and available when the Class Vehicles and L87 Engines were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce.

192.   Defendant failed to design, test, validate, manufacture, and place in the stream of commerce a Class Vehicle and L87 Engines that are free from the Defect and the unreasonable safety risks it poses.

193.   The Defect causes damage to property other than the L87 Engine itself, including damage to other components of the Class Vehicles as a result of engine failures and other property located within the vehicles.

194.   As a direct and proximate result of Defendant's actions as described herein, Plaintiff and the other Class Members have been damaged in an amount to be determined at trial.

## COUNT V: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (On Behalf of the Nationwide Class)

195.   Plaintiff incorporates by reference every allegation set forth in preceding paragraphs as if fully stated herein.

196.   Plaintiff brings this claim on behalf of himself and the Nationwide Class for breach of implied warranty pursuant to U.C.C. § 2-314.

197.   Defendant is a "merchant," a "seller," and "lessor" of motor vehicles under the U.C.C.

198.   Defendant was, at all relevant times, the manufacturer, distributor, warrantor, seller and/or lessor of the Class Vehicles. Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

199.   GM impliedly warranted that the Class Vehicles and any parts thereof are of merchantable quality and fit for the ordinary purposes for which they were sold. This implied warranty included, among other things, a warranty that the Class Vehicles are safe and reliable for providing transportation and would not result in the premature wear and eventual failure of its engine. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, *inter alia*, the Class Vehicles suffered from the Engine Defect at the time of sale that creates the undue risk of engine failure and stalling while driving. Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

200.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and other Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles suffer from a defective design(s) and/or manufacturing defect(s).

201.   Defendant had actual knowledge of the Engine Defect, and wrongfully and fraudulently concealed these material facts from Plaintiff and the Class.

Defendant was provided notice of these issues through, *inter alia*, warranty claims, its defect investigations, complaints posted on the internet, customer lawsuits, and complaints lodged by consumers with NHTSA – which Defendant routinely monitors – before or within a reasonable amount of time after the allegations of the Defect became public. Plaintiff, individually and on behalf of the Classes, also notified GM of the Engine Defect and the breach of warranty alleged herein through a notice letter, dated June 17, 2025.

202.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

203.   Plaintiff and other Class members have had sufficient direct dealings with Defendant to establish privity of contract between Defendant on one hand, and Plaintiff and each of the other Class members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between Defendant and their dealers, and specifically, of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Additionally, privity is excused here because Plaintiff and each of the other Class members relied on statements made by Defendant itself in choosing to purchase or lease a Class

Vehicle. As alleged herein, the marketing of the Class Vehicles was uniform, and was controlled and disseminated directly by Defendant.

204. Plaintiff, on behalf of himself and the Class, seeks monetary damages, treble damages, costs, attorneys' fees, and such other and further relief provided by law and equity.

## COUNT VI:
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
## (815 ILL. COMP. STAT. 505/1 *et seq.*)
## (On Behalf of the Illinois Class)

205. Plaintiff incorporates by reference every allegation set forth in preceding paragraphs as if fully stated herein.

206. Plaintiff brings this claim individually and on behalf of the other members of the Illinois Class.

207. The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits unfair or deceptive acts or practices in connection with any trade or commerce, "including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILL. COMP. STAT. 505/2.

The Illinois CFA also prohibits suppliers from representing that their goods are of a particular quality or grade they are not.

208.   GM is a "person" as that term is defined in 815 ILL. COMP. STAT. 505/1(c).

209.   Plaintiff and the Illinois Class are "consumers" as that term is defined in 815 ILL. COMP. STAT. 505/1(e).

210.   As alleged more fully herein, GM has violated Illinois' prohibition on unfair conduct because its acts, omissions, policies, and course of conduct: (a) offend public policy; (b) are immoral, unethical, oppressive, and unscrupulous; and (c) cause substantial injury to consumers in violation of the Illinois CFA. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417 (2002). Its unfair business practices include failing to disclose, at the point of sale or otherwise, that the Class Vehicles contain the Engine Defect and pose a safety hazard.

211.   GM has also violated the Illinois CFA's prohibition on deceptive conduct in that it used unconscionable business practices by failing to disclose to Plaintiff and other members of the Illinois Class, in its public statements touting the safety of the Class Vehicles including at the point of sale, that the Class Vehicles contain the Engine Defect.

212.   As a direct and proximate result of GM's failure to disclose the Defect, Plaintiff and other members of the Illinois Class have been harmed in that they

purchased Class Vehicles they otherwise would not have; paid more for Class Vehicles than they otherwise would have; and are left with Class Vehicles of diminished value and utility because of the Defect. Meanwhile, GM has sold more Class Vehicles than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

213.  Plaintiff seeks damages and appropriate equitable relief, including an Order requiring GM to adequately disclose and repair the Defect, and an Order enjoining GM from incorporating the Defect into its vehicles in the future.

214.  Based on the foregoing, Plaintiff and the Illinois Class are entitled to all remedies available pursuant to the Illinois CFA, including refunds, actual damages, liquidated damages, punitive damages, attorneys' fees, and other reasonable costs. Plaintiff and the Illinois Class also request that the Court award equitable relief, including an Order requiring GM to adequately disclose and repair the Defect and an Order enjoining GM from incorporating the Defect into its vehicles in the future.

### COUNT VII: BREACH OF IMPLIED WARRANTY
### OF MERCHANTABILITY
### (810 ILL. COMP. STAT. 5/2-314, 810 ILL. COMP. STAT. 5/2A-212)
### (On Behalf of the Illinois Class)

215.  Plaintiff incorporates by reference every allegation set forth in preceding paragraphs as if fully stated herein.

216.   Plaintiff brings this claim individually and on behalf of the other members of the Illinois Class.

217.   GM is a "merchant" (as defined by 810 Ill. Comp. Stat. 5/2-104(1)), a "seller" (as defined by 810 Ill. Comp. Stat. 5/2-103(1)(d)), and a "lessor" (as defined by 810 Ill. Comp. Stat. 5/2A-103(1)(p)) of Class Vehicles.

218.   The Class Vehicles are "goods" (as defined by 810 Ill. Comp. Stat. 5/2-105(1) and 810 Ill. Comp. Stat. 5/2A-103(h)).

219.   Pursuant to 810 Ill. Comp. Stat. 5/2-314(1), "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."

220.   Pursuant to 810 Ill. Comp. Stat. 5/2A-212(1), "a warranty that the goods will be merchantable is implied in a lease contract if the lessor is a merchant with respect to goods of that kind."

221.   Goods are merchantable if they are "fit for the ordinary purposes for which such goods are used" and "conform to the promises or affirmations of fact made on the container or label if any." 810 Ill. Comp. Stat. 5/2-314(2)(c), (f); 810 Ill. Comp. Stat. 5/2A-212(2)(c), (f).

222.   Defendant was, at all relevant times, the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendant knew or had reason to know of the specific use for which the Class Vehicles were purchased.

223.   Defendant provided Plaintiff and the Illinois Class members with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because, *inter alia*, the Class Vehicles suffered from the Engine Defect at the time of sale that creates the undue risk of the engine stalling while driving. Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

224.   Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things, a warranty that the Class Vehicles were manufactured, supplied, distributed, and/or sold by Defendant, were safe and reliable for providing transportation, and would not result in the vehicles stalling in the middle of traffic.

225.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and other Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles suffer from a defective design(s) and/or manufacturing defect(s).

226.   Defendant had actual knowledge of the Engine Defect, and wrongfully and fraudulently concealed these material facts from Plaintiff and the Class.

69

Defendant was provided notice of these issues through, *inter alia*, warranty claims, its defect investigations, complaints posted on the internet, customer lawsuits, and complaints lodged by consumers with NHTSA – which Defendant routinely monitors – before or within a reasonable amount of time after the allegations of the Defect became public. Plaintiff, individually and on behalf of the Classes, also notified GM of the Engine Defect and the breach of warranty alleged herein through a notice letter, dated June 17, 2025.

227.  Defendant's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

228.  Plaintiff and the Illinois Class members have had sufficient direct dealings with either Defendant or its agents (*e.g.*, dealerships, consumer affairs departments, and technical support) to establish privity of contract between Defendant on one hand, and Plaintiff and each of the other Class members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between Defendant and their dealers, and specifically, of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Defendant was also aware that the ultimate consumers of the Class Vehicles

(*i.e.*, the Class) required vehicles that would function safely, could be relied upon, and otherwise meet minimum industry standards. Additionally, privity is excused here because Plaintiff and each of the other Class members relied on statements made by Defendant itself in choosing to purchase or lease a Class Vehicle. As alleged herein, the marketing of the Class Vehicles was uniform, and was controlled and disseminated directly by Defendant.

229.   Plaintiff, on behalf of himself and the Illinois Class, seeks monetary damages, treble damages, costs, attorneys' fees, and such other and further relief provided by law and equity.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of members of the Class, respectfully requests that this Court:

a.      Certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative; and appoint Plaintiff's counsel as Class Counsel;

b.      Declare that any applicable statutes of limitations are tolled due to Defendant's fraudulent concealment and that Defendant is estopped from relying on any statutes of limitations in defense;

c.      Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendant to repair and/or recall the Class

71

Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiff and Class Members with appropriate curative notice regarding the existence and cause of the Defect;

d.      Award Plaintiff and Class Members actual, compensatory, general, special, incidental, statutory, punitive, and consequential damages, costs, and disgorgement in an amount to be determined at trial;

e.      Award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

f.      Award pre- and post-judgment interest at the maximum legal rate;

g.      Grant leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

h.      Grant all such other relief as is just and proper.

## VIII.      DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all claims so triable.

Dated:      June 18, 2025

> /s/ Dennis A. Lienhardt
> E. Powell Miller (P39487)
> Dennis A. Lienhardt (P81118)
> Dana E. Fraser (P82873)
> THE MILLER LAW FIRM PC
> 950 W. University Drive, Suite 300
> Rochester, MI 48307
> Telephone: (248) 841-2200
> epm@millerlawpc.com
> dal@millerlawpc.com
> def@millerlawpc.com

Elizabeth A. Fegan
**FEGAN SCOTT LLC**
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Phone: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

Jonathan D. Lindenfeld
**FEGAN SCOTT LLC**
305 Broadway, 7th Floor
New York, NY 10007
Phone: 332.216.2101
Fax: 312.264.0100
jonathan@feganscott.com

*Attorneys for Plaintiff*